JACOBS et al. v. FIRST NAT. BANK OF SHREVEPORT et al.

No. 6016.

Circuit Court of Appeals, Fifth Circuit.

April 1, 1931.

Rehearing Denied April 24, 1931.

See, also, 35 F.(2d) 227.

Albert P. Garland and Samuel F. Hyman, both of Shreveport, La., and Charles E. Dunbar, Jr., of New Orleans, La. (Samuel F. Hyman and Albert P. Garland, both of Shreveport, La., and Spencer Gidiere, Phelps & Dunbar, of New Orleans, La., on the brief), for appellants.

Elias Goldstein and H. C. Walker, Jr., both of Shreveport, La. (Blanchard, Goldstein, Walker & O'Quin, of Shreveport, La., on the brief), for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The appellant Mrs. Lotta F. Jacobs, joined by another as intervener, brought a bill as minority stockholder in Florsheim Bros. Dry Goods Company, Limited, to recover judgment in behalf of the corporation against appellees First National Bank of Shreveport and six individuals, to wit, Andrew Querbes, Dave Mendelsohn, W. L. Young, O. L. Biedenharn, J. H. Jordan, and Seymour L. Florsheim, because of misapplication of the funds of the corporation and damage done its business and good will by them. The decree was for the defendants, and the question here is the propriety of the decree under the evidence. The bill averred that the bank, its president, Querbes, and three others of its officers, Young, Biedenharn, and Jordan, conspired in 1925 with Mendelsohn to get control of the corporation for the purpose of paying the bank a large pretended debt, and of then securing the property of the corporation for their own use, and that by threat of a receivership for the corporation in January, 1926, they compelled Mrs. Minnie Florsheim and other stockholders to transfer to said bank officers a majority of the stock and to substitute them and Mendelsohn as directors in lieu of the duly elected directors of the company, and thus to put control securely in them; that they had unlawfully kept charge of the corporation until December, 1928, when control had been yielded to Querbes

and the bank, who had discharged the salesmen, stopped purchases, and disturbed the business as a going business to its damage in the sum of $225,000, and had diverted to the bank $133,000 in wrongful payment of the fictitious debt, with interest, and had wrongfully paid $1,100 to the attorneys of the bank, and $18,500 as salary to Mendelsohn for services as pretended president of the corporation since January, 1926. The only prayer was for a money judgment. The answer put all important allegations in issue.

The evidence is voluminous, and only its general results can be stated. The bank in January, 1926, held the notes of the corporation for $110,000 principal. The consideration of the notes was not shown. It was proven that in 1912 and 1913 the bank had paid numerous checks amounting to $233,155, drawn in the name of the corporation against its deposit account by Edgar Florsheim, payable to his own order, or to cash, or to a certain firm known to the bank to be brokers of cotton futures. Edgar Florsheim was then in charge of the finances of the company, and had full authority to draw checks. It was not proven, but only suggested, that these checks were really misapplications of the corporate funds, nor was any connection shown between them and the notes held by the bank. The bank officers testified that they had paid the checks in good faith and without question. So far as appears, the payment was never challenged by the corporation, and, if the bank was liable for having assisted in a misapplication of funds in 1912 and 1913, the matter has long since been barred by limitation, if not in fact ratified. There is no evidence that the notes for $110,000 were not good and valid debts against the corporation in January, 1926. At that date the bank, being dissatisfied at recent losses of the corporation and at very heavy overdrafts on it by its stockholders, members of the Florsheim family, demanded payment of its notes, and had its attorneys prepare papers to secure a statutory receivership against the corporation. There is no proof that any other object was in view than to collect the bank's debt.

To avoid the receivership, Mrs. Minnie Florsheim, who held 252 shares out of a total of 300 shares of the stock, joined with her sons, Seymour, Louis, and Bernard Florsheim, who owned 14 shares, in an agreement with the bank to assign 151 shares, being a majority, in trust to Young, a director of the bank, and a share each to Jordan and Biedenharn, two other directors, and a share to Mendelsohn, in order to qualify them to become directors of the corporation along with Seymour Florsheim; they to conduct the business of the corporation with a view to liquidating its debts and to continue it as a going concern, if it could be so operated without additional capital, or, if additional capital could be secured, the operation not to continue longer than a year unless agreed to by the bank and Mrs. Florsheim. The right to apply for a receivership was retained if the bank's attorneys should at any time advise it to be necessary to the bank's interest as a creditor, and the bank's attorneys were to be paid their charges by the corporation. Mrs. Minnie Florsheim was to be retained as vice president at a salary of $5,000, though inactive. Mendelsohn was a retired merchant from another city induced by the bank to come and take charge of the business as president and manager. He entertained at first a purpose of acquiring an interest in the business, but there is no proof of any corrupt conspiracy improperly to obtain the corporate property. The new directors were elected in stockholders' meeting regularly called. The directors then elected the president and vice president as agreed, and fixed Mendelsohn's salary as president at $6,000 per year, giving him general supervision of the business, including the right to discharge and employ all employees. The directors had no salary. At the end of the year the agreement was extended for another year, and the same officers re-elected; Mrs. Florsheim's salary as vice president being reduced to $3,000.

During 1927 Mrs. Florsheim died, and on October 15, 1927, the complainant and the intervener were admitted with others as heirs in the succession of her estate. This apparently is the source of their ownership of the stock in the corporation. It does not appear what occurred in January, 1928, at the second expiration of the agreement, but the management seems to have continued as before. In December, 1928, Samuel Hyman, the husband of one of Mrs. Florsheim's daughters and owner of 10 shares of stock, demanded that the stock held by Young as trustee, and by Biedenharn, Jordan, and Mendelsohn, be returned to the heirs of Mrs. Florsheim that the corporate control might be changed. Up to this time the business had been prosperously managed, all the corporation's mercantile debts were paid, and its credit and good will were well established. The bank, however, had been paid nothing. A dispute resulted from Hyman's demand,

as a consequence of which, while Young, Mendelsohn, Jordan, and Biedenharn professed a willingness to surrender their stock to Hyman upon a proper showing of authority from all the heirs to receive it, the bank again prepared to obtain a receivership against the corporation. Seymour, Bernard, and Louis Florsheim disavowed Hyman's demand, and represented that the stockholders wished to continue the former management until the business could be liquidated sufficiently to pay the bank. A written agreement to this effect to be signed by all the stockholders was drawn up and sent out for signature. By it Querbes, the president of the bank, was to exercise control during the liquidation, and the bank was to have the right to a receiver if the bank decided it to be desirable. Querbes did have Mendelsohn, as president, to discharge the salesmen, discontinue purchases, sell sample cases, and announce a probable liquidation, and otherwise to reduce expenses, while Bernard Florsheim undertook to force collections. The agreement, however, though efforts to perfect it were active as late as January 30, 1929, was never signed up. Nevertheless the policy of liquidation was continued, and by March 14, 1929, the date of filing this bill, the bank and all other creditors had been paid off. The directors met on March 16, and ratified all that had been done. Mendelsohn resigned as president and Young as secretary-treasurer, and Seymour Florsheim and Bernard Florsheim were elected in their places. A meeting of stockholders was called to elect directors on April 6, 1929, and Mendelsohn, Young, Biedenharn, and Jordan resigned as such.

Until December, 1928, we see no reason to doubt that every stockholder knew of, and acquiesced in, what was done, or that what was done was actually in line with the corporate interests. The corporation has no cause of complaint thereabout against its managing officers. The salary of Mendelsohn as president was regularly fixed, and was reasonable, being $1,500 less than was paid in 1925 and $4,000 less than paid in 1924. There is no case for recovery on that account.

▉ The conduct after December, 1928, of Querbes and the bank, acquiesced in and abetted by the managing officers of the corporation, was high-handed and unjustifiable, apart from the expected consent of the stockholders, which was never given. But a receivership, the lawful remedy, would have been more drastic, and proceedings under it would have been along the same line but more expensive and harmful to the business as a going concern, and there was no resulting damage as it actually turned out, for, while no doubt the business of 1929 was curtailed, the testimony is that that was a bad year for merchandise jobbers, and the general business collapse following the stock market crash in the fall of 1929 we may judicially notice. The smaller the credit business done in 1929, the better the final results. This corporation, when its affairs were turned over to the stockholders April 1, 1929, had a new clean stock of merchandise, owed no debts worth mentioning, had comparatively little uncollected accounts, a surplus of some $5,000 above its capital stock at par, and a good credit. No damage has been established as done by its partial liquidation. The payment of the bank's debt, with interest, was, of course, not a thing the corporation can complain of; it being a just obligation. The interest accruing on it also was a legal demand against the corporation. That merchandise creditors were paid first is no matter for complaint, nor that by forcing collection earlier than was finally done is it certain that interest would have been saved. Presumably the uncollected accounts themselves drew interest after maturity. Forcing collection is not always a good business policy, and it is not to be assumed that the capital borrowed from the bank was not needed while the business was actively going on. The payments to the bank's attorneys when the receivership proceedings were abandoned, $1,000 in 1926 and $100 in 1929, were agreed to by the corporation, and actually fixed by conference with Mr. Hyman. They were just one-tenth the amount the corporation would have had to pay if the bank's attorneys had continued to collect by law the bank's notes of $110,000, for the notes promised 10 per cent. as attorneys' fees if thus collected.

We think the decree for the defendants was fully warranted, and it is affirmed.